Deautri C. DENARD, Petitioner,

v.

**DIRECTOR, DEPARTMENT OF CORRECTIONS, Respondent.**

No. CV 96–5167–HLH(RC).

United States District Court, C.D. California.

May 29, 1997.

Deautri C. Denard, Crescent City, CA, pro se.

Donald J. Oeser, California Office of the Attorney General, Los Angeles, CA, for Respondent.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

HUPP, District Judge.

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Petition and other papers along with the attached Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, and has made *de novo* determination.

IT IS ORDERED that (1) the Report and Recommendation is approved and adopted; (2) the Report and Recommendation is adopted as the findings of fact and conclusions of law herein; and (3) Judgment shall be entered denying the petition for writ of habeas corpus and dismissing the action with prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommen-

dation and Judgment by the United States mail on petitioner and counsel for respondents.

## REPORT AND RECOMMENDATION ON A STATE HABEAS CORPUS PETITION

CHAPMAN, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Harry L. Hupp, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

## BACKGROUND

### I

In an amended information filed on January 22, 1990, in the Los Angeles Superior Court, the petitioner Deautri C. Denard, a California state prisoner, and several co-defendants, were charged with the following offenses: kidnapping for ransom (California Penal Code ("P.C.") § 209(a)), with the allegation that Kelly Timmons, the victim, suffered bodily harm and was intentionally confined in a manner which exposed her to a substantial likelihood of death (count 1); oral copulation by acting in concert (P.C. § 288a(d)) (counts 2 and 5); forcible rape while acting in concert (P.C. § 264.1) (counts 3, 4 and 6); conspiracy to commit murder (P.C. §§ 182 and 187) (count 8);[1] and two murders (P.C. § 187(a)), with the special circumstances that the murders were for financial gain (P.C. § 190.2(a)(1)), were committed during the commission of a kidnapping (P.C. § 190.2(a)(17)) (counts 9 and 10), and with regard to count 10, a multiple murder (P.C. § 190.2(a)(3)); shooting into an inhabited dwelling (P.C. § 246) (count 11); and two attempted murders (P.C. §§ 187(a) and 664) (counts 12 and 13). CT 2083–2092. The petitioner also was alleged to have been convicted of a prior violent felony (P.C. § 667.5). CT 2059–60.

On September 23, 1991, the petitioner was convicted by a jury of kidnapping Kelly Timmons for ransom (count 1); the first-degree murder of Latonjyia Stover (count 9); the second-degree murder of Jamee Finney (count 10); shooting into an inhabited dwelling (count 11); and assaulting Robert Newman with a deadly weapon (count 12). CT 4667, 4678, 4691, 4707, 4717, 4734, 4736, 4739, 4743, 4745. The jury also found that, in count 1, Kelly Timmons, had suffered bodily harm; that the first-degree murder, in count 9, was committed while the petitioner was engaged in the commission of the crime of kidnapping for ransom or kidnapping; that the petitioner committed multiple murders as alleged in count 10; and that the petitioner had previously been convicted of a robbery on March 9, 1982. CT 4667, 4697, 4732, 4734, 4740, 4742, 4748. The petitioner was found not guilty of forced oral copulation by acting in concert (count 5), forcible rape while acting in concert (count 6), and the attempted murder of Anthony Milner (count 13). CT 4673, 4675, 4722, 4735–36, 4746. The jury was unable to reach a verdict on the financial gain special circumstance alleged in counts 9 and 10, two counts of forcible rape while acting in concert (counts 3 and 4), and one count of oral copulation by acting in concert with force (count 2). CT 4733, 4751.

At the penalty phase of the trial, the jury determined that, as a result of the petitioner's conviction for first-degree murder with special circumstances (count 9), he should be sentenced to life imprisonment without the possibility of parole. CT 5066, 5068.

On January 31, 1992, the trial court sentenced the petitioner to 27 years to life plus two consecutive terms of life without the possibility of parole for his multiple convictions, as follows: the petitioner was sentenced to life without the possibility of parole for his first-degree murder conviction; life without the possibility of parole for his kidnapping for ransom conviction; fifteen years to life for his second-degree murder conviction; and seven years for his conviction for shooting into an inhabited dwelling. CT 5188, 5197–98. The petitioner also received a

---

1. The prosecution dismissed count 8 before instructions and argument; however, the case was argued on an uncharged conspiracy theory. Answer, Exh. A at 102.

three-year stayed sentence for assault with a deadly weapon, and a five-year sentence enhancement for a prior felony conviction. *Id.*

The petitioner appealed his convictions to the California Court of Appeal. Answer, Exh. A. In an unpublished opinion,[2] the California Court of Appeal affirmed the judgment on October 12, 1995. *Id.*

On November 14, 1995, the petitioner filed a petition for review in the California Supreme Court.[3] Answer, Exh. B. The California Supreme Court denied the petitioner's and his co-defendants' petitions on January 24, 1996. Answer, Exh. F.

## II

The instant habeas corpus petition was filed on July 25, 1996. In this petition, the petitioner raises the following claims: (1) there was insufficient evidence to support the jury's determination that the first-degree murder occurred while the petitioner was involved in a kidnapping; (2) the prosecutor improperly exercised her peremptory challenges to exclude black jurors from the jury; (3) the giving of CALJIC 10.60 violated the petitioner's right to due process of law; (4) the giving of CALJIC 2.27 violated the petitioner's right to due process of law; and (5) the trial court erred when it failed to allow cross-examination of Kelly Timmons[4] on her false claim that she became pregnant as a result of the alleged rapes. The respondent filed an answer on October 25, 1996, and an amended answer on October 31, 1996. The petitioner did not file a traverse.

## III

The California Court of Appeal found the following facts and circumstances underlying the petitioner's convictions.[5] On May 9, 1988, John Jay Porter telephoned Roland Timmons and asked if Mr. Timmons knew where Porter could buy cocaine for the petitioner. Mr. Timmons, who previously had sold drugs with Porter, asked his sister, Kelly Timmons, if she could set up the transaction. Ms. Timmons arranged for Porter and the petitioner to give $14,000 to B.J. Bates, a drug supplier, in exchange for a kilo of cocaine, with herself as a go-between. Ms. Timmons drove to Porter's house, met Porter and petitioner and received the money. After counting the money, Mr. Timmons met Bates's underling at the agreed meeting place, gave him the money, and received a plastic bag containing white powder. Ms. Timmons drove back to Porter's house and gave the bag to Porter and the petitioner. As Ms. Timmons was leaving, Porter and the petitioner ran outside, shouting that she had given them flour instead of cocaine, and forcing her inside the house at gunpoint.

Ms. Timmons, who had not known the powder was flour, unsuccessfully tried to telephone Bates. She made a series of calls to her brother, in which she told him Porter and the petitioner wanted their money or the cocaine and would kill her if he did not comply. During the calls, Porter and the petitioner repeatedly told Mr. Timmons they would kill his sister if their demands went unmet. During one of these calls, Mr. Timmons heard the petitioner blame Porter for the situation and threaten to kill Porter. Mr. Porter sounded scared in the initial calls, but never asked for help.

The petitioner telephoned Daron Lively. Shortly thereafter, Lively and Vincent Burks arrived in a beige jeep. Mr. Lively and the petitioner forced Ms. Timmons into the jeep at gunpoint, and Ms. Timmons, Burks, petitioner, Lively, and Porter drove a circuitous route to an apartment. En route, the petitioner called Meridith Carter on a cellular telephone and told her to bring guns to the apartment. The men also called Mr. Timmons again and repeated their threats to kill

---

2. *People v. Denard*, et al., B066109 (1995).

3. In his petition, the petitioner also joined in portions of his co-defendants' petitions for review by the California Supreme Court. Answer, Exh. B. The petitioner's co-defendants' petitions for review by the California Supreme Court are attached to the respondent's answer as Exhs. C, D, and E.

4. Kelly Timmons is also referred to throughout the Reporter's Transcript as Kelly Davis and Kelly Timmons–Davis. For convenience and clarity, she will be referred to as Kelly Timmons or Ms. Timmons, herein.

5. Answer, Exh. A., 97–102.

his sister unless they received the cocaine or money.

Lyndell Jackson arrived at the apartment shortly after the beige jeep, as did another man named Moe. Ms. Carter and a woman named Red arrived a little later. After the petitioner told Carter what had happened, Carter pointed a gun at Ms. Timmons and petitioner said Carter should kill her.

Lively and the petitioner forced Ms. Timmons to give them information about Bates, his sister, family, address, and cars. Lively said the men should retaliate against Bates. Mr. Porter and the petitioner, in a series of telephone calls to Mr. Timmons, repeated their death threats against Mr. Timmons and his family. They also telephoned such a threat to Mr. Timmons' mother. Meanwhile, Mr. Timmons called the police, who came to his house and placed a telephone trap on his line to determine the threatening calls' origin.

The petitioner sent Burks and Porter to get ammunition. They returned with it. The petitioner and Lively said they were going to retaliate against Bates. At the petitioner's request, Carter supplied a box of surgical gloves and a bag containing a dark sweatshirt, ski masks, and gloves. Burks, Lively, and Porter donned surgical gloves and wiped off several guns. The petitioner distributed masks to Burks, Lively, and Porter. The petitioner and Lively put gloves in their pockets. The petitioner announced that they were going to find and kill Bates and told Carter and Jackson to stand guard over Ms. Timmons. Burks, Denard, Lively, and Porter, all armed, left together, leaving Carter, Jackson, Moe and Red to guard Ms. Timmons.

While the four men were gone, Carter and Jackson tied up Ms. Timmons. At one point, Ms. Timmons called out a window to a passerby. Jackson and Carter threw Ms. Timmons into a door and onto the floor, and repeatedly kicked, punched and beat her.

Meanwhile, several witnesses, some of whom knew the four men, saw a blue jeep driven by the petitioner and a beige jeep occupied by Lively, each with other men inside, approach a red Pontiac parked near 45th Street and St. Andrews. The men wore masks and dark clothes. Latonjyia Stover and Jamee Finney, two women unconnected to these events, were inside the Pontiac, talking to a pedestrian. When Stover and Finney saw the two jeeps drive by, they drove off, telling the pedestrian they feared a shooting was about to happen. The two jeeps followed.

Witnesses heard gunshots and saw the jeeps stop near the Pontiac and drive off. Stover and Finney each died of multiple gunshot wounds. Shortly thereafter, Robert Newman heard gunshots and went outside. Witnesses saw the beige jeep occupants twice fire shots at Newman's house, and once at another nearby house. Newman saw the beige jeep occupants firing at people in the street. Newman saw Lively, who he knew, in the rear of the beige jeep pointing a gun. Newman ran. The beige jeep stopped and its occupants fired shots at Newman. Witnesses placed Lively and Porter inside beige jeep when these shots were fired.

The petitioner, Burks, Lively and Porter returned to the apartment where Ms. Timmons was being held. The petitioner, Lively and Porter all boasted of the killings. During another telephone call to Mr. Timmons, the petitioner told Mr. Timmons that they wanted their money.

Meanwhile, Los Angeles Police Detective Mark Arneson learned from the telephone company that the calls to Mr. Timmons had come from 13132 South Vermont Ave., apartment 6. The police set up a command post nearby and began surveillance of the apartment. Porter left the apartment and drove off in a yellow Toyota. The petitioner told Carter to go and warn his mother to leave her house because of potential retaliation from Bates. Carter left. When a police helicopter arrived overhead, the petitioner walked down the apartment hallway, went outside, and was arrested by the police.

When the remaining occupants saw the petitioner's arrest, Burks and Lively each telephoned their mothers and told them of the killings and to leave their homes to avoid retaliation. Lively then ordered Ms. Timmons to leave the apartment first, so that if the police fired on them as they left, Ms.

Timmons would be hit. Ms. Timmons, Lively, Jackson, and Burks then left the apartment, and police arrested the three men. Shortly thereafter, Carter returned in a white Hyundai owned by the petitioner. Ms. Timmons identified Carter and the police arrested her. The police traced Porter to another house and arrested him the next day.

Much circumstantial evidence also linked the defendants to the crimes. Police found the beige jeep parked behind the apartment. The jeep contained a bullet hole, bullet crease, powder burns, and an expended bullet. Lively, Porter, and Burks left fingerprints on the jeep, and petitioner left a fingerprint on a plastic bag found inside it. Inside the apartment, police found ammunition, sunglasses, caps, and gloves. Some of the gloves contained gunshot residue.

At the murder scene, the police recovered numerous shell casings and bullet fragments of similar caliber ammunition as used by the types of guns recovered in the garage and which witnesses described petitioner, Burks Lively, and Porter carrying during the crimes. Police also recovered a black cap near the dwellings which had been fired on. A hair found inside the cap was similar to Lively's hair.

In defense, several witnesses were impeached with prior inconsistent statements about some aspect of their description of the jeeps, their location at various times, and their identification of the defendants. Other witnesses claimed the jeeps' windows were too dark to permit identification of the occupants, or gave different descriptions of the cars involved in the shootings. Ms. Timmons also was impeached with evidence that she had pled guilty to stealing over $2,600 from her Employer, a bank, in 1989. Mr. Porter's girlfriend claimed that, on the day of the crimes, he was with her from the late afternoon on.

## DISCUSSION

### IV

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), effective April 24, 1996, worked substantial changes to the law of habeas corpus. *Moore v. Calderon,* 108 F.3d 261, 263–64 (9th Cir.(Cal.)). Of specific importance to the petitioner's claims are the revisions made to 28 U.S.C. § 2254(d), which now states that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim [¶] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or [¶ 1] (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Here, the petitioner filed his petition for writ of habeas corpus on July 25, 1996, after the effective date of the AEDPA. Thus, the habeas corpus revisions contained within the AEDPA are applicable to the instant habeas corpus petition.

### V

To review the sufficiency of the evidence in a habeas corpus proceeding, the court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). All evidence must be considered in the light most favorable to the prosecution. *Id.* These standards are applied to the substantive elements of the criminal offense defined by state law. *Id.* at 324 n. 16, 99 S.Ct. at 2792 n. 16.

 Under California law, the felony-murder special circumstance is applicable to a murder committed while the defendant was engaged in certain enumerated felonies, including kidnapping. P.C. § 190.2(a)(17)(ii).[6] The felony-murder special circumstance re-

---

**6.** Since 1991, this subsection has been renumbered; currently, it is found at P.C. § 190.2(a)(17)(B).

quires the trier of fact to find that the defendant committed the act resulting in murder in order to advance an independent felonious purpose (kidnapping). *People v. Bonin,* 47 Cal.3d 808, 850, 254 Cal.Rptr. 298, 323, 765 P.2d 460 (1989), *cert. denied,* 494 U.S. 1039, 110 S.Ct. 1506, 108 L.Ed.2d 641 (1990); *People v. Hernandez,* 47 Cal.3d 315, 348, 253 Cal.Rptr. 199, 218, 763 P.2d 1289, *cert. denied,* 491 U.S. 910, 109 S.Ct. 3201, 105 L.Ed.2d 709 (1989). Thus, the trier of fact could not find the defendant guilty of the felony-murder special circumstance true if the kidnapping was "merely incidental to the commission of the murder, an afterthought." *People v. Garrison,* 47 Cal.3d 746, 791, 254 Cal.Rptr. 257, 282, 765 P.2d 419, 444 (1989); *People v. Raley,* 2 Cal.4th 870, 903, 8 Cal. Rptr.2d 678, 699, 830 P.2d 712 (1992).

■ The petitioner initially contends that "[t]here was no causal connection between the homicide of Nikki Stover and the kidnapping of Kelly Timmons. Therefore, the killing of Nikki Stover did not advance the kidnapping and there was no special circumstance liability." Petition, at 6. The petitioner is mistaken.

Here, evidence was presented demonstrating that Kelly Timmons arranged a drug deal for the petitioner and Porter in which the petitioner would purchase a kilo of cocaine from Bates in exchange for $14,000, with Ms. Timmons acting as the go-between. Answer, Exh. A at 97–98; *see also* Reporter's Transcript ("RT") 11332:26–11335:2. After the petitioner and his co-defendants discovered they had been duped in the deal, they kidnapped Ms. Timmons, and forced her to make telephone calls to Bates and her brother, in an effort to get the defendants' money or drugs back. Answer, Exh. A at 98–100; *see also* RT 9400:1–9408:14, 9410:12–9413:10, 11362:1–6, 11364:27–11370:24, 11371:12–22. During these telephone calls, the petitioner and Porter repeatedly told Mr. Timmons that his sister would be killed if their demands were not met. Answer, Exh. A at 98–100; *see also* RT 9400:1–9408:14, 9410:12–9413:10, 11362:1–6. Ms. Timmons was subsequently taken to an apartment by the petitioner and his co-defendants. Answer, Exh. A at 98;

*see also* RT 1L389:20–11393:4. Ms. Timmons was forced to give information about Bates, his sister Nina, his family, his address, and the type of cars he drove. Answer, Exh. A at 99; *see also* RT 11421:10–23. The defendants gathered guns and ammunition, dressed in ski masks and gloves, and left to try and kill Bates, his sister or "some of his people." Answer, Exh. A at 99; *see also* RT 11450:1–11451:20, 11453:21–24, 11469:1–11470:24, 12870:27–12871:23. Instead, the petitioner and his co-defendants mistakenly shot and killed Stover and Finney, who had nothing to do with the drug deal. Answer, Exh. A. at 99–100; *see also* RT 8453:7–27, 8459:5–20, 11502:7–11503:14. When they returned to the apartment, the petitioner, and several of his co-defendants, boasted of the killings. Answer, Exh. A at 100; *see also* RT 11493:27–11494:20, 11496:3–13, 11502:7–11503:14. Mr. Timmons was subsequently called, informed of the killings, and warned that he better comply with the defendants' demands by 9:00 p.m. Answer, Exh. A at 100; *see also* RT 11506:2–11507:25.

Thus, the evidence presented shows that the defendants held Kelly Timmons captive in an effort to recoup their drug purchase money, that the petitioner and his co-defendants murdered Stover and Finney while Ms. Timmons was still a hostage, and that the petitioner and his co-defendants, to further their ransom demands, told Roland Timmons that they had killed Stover and Finney. Considering this evidence in the light most favorable to the prosecution, it is clear that although revenge against Bates or his family may have been the primary motive for the killings, there was sufficient evidence for the jury to conclude that the murders had the additional felonious purpose of reinforcing the defendants' repeated threats to kill Ms. Timmons if they did not receive their money or the cocaine they had intended to purchase.

**VI**

The California Court of Appeal made factual findings concerning the petitioner's claim that the prosecutor committed "Batson error"[7] because she exercised 23 of her 42

7. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

peremptory challenges on black jurors. The court found that:

> The original. jury venire consisted of 52 black jurors, 50 white jurors, 9 Asian jurors, and 25 Hispanic jurors. Thus, the black prospective jurors comprised 38% of the venire. As the original petit jury sworn to try the case, the prosecutor used 41 [8] peremptory challenges, 23 of which excused black prospective jurors. Thus, 53% [9] prosecutor's peremptory challenges were used to exclude black prospective jurors. The original petit jury included 4 black jurors. As to the alternates, 8 of the prospective 16 peremptory challenges, or 50%, excluded black prospective jurors. Three of the six alternates were black. During deliberations, 1 black alternate juror replaced a non-black juror. Thus, the jury which returned the verdicts included 5 black jurors.

Answer, Exh. A at 110.

In evaluating claims of racial discrimination in the exercise of peremptory challenges, a three-step analysis is applied: "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 766–67, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 *reh'g denied*, —— U.S. ——, 115 S.Ct. 2635, 132 L.Ed.2d 874 (1995); *Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 1865–66, 114 L.Ed.2d 395 (1991).

8. The petitioner argues that the prosecution exercised 42 peremptory challenges. Petition, at 7.

9. 23/41 is 58%; 23/42 is 55%.

10. To make a prima facie showing that the prosecution has exercised the peremptory challenges on the basis of race, the petitioner must establish that: (1) he is a member of a cognizable racial group; (2) the prosecution has removed members of such a racial group; and (3) circumstances raise an inference that the challenges were motivated by race. *Batson*, 476 U.S. at 96,

The respondents initially contend that the trial court correctly determined that the defendants had not made a prima facie showing of racial discrimination in the exercise of peremptory challenges.[10] Although the trial court repeatedly found that the defendants had not established a prima facie case of racial discrimination in the prosecution's utilization of peremptory challenges,[11] the trial court, nevertheless, required the prosecutor to explain on what basis she exercised her peremptory challenges. RT 6059:13–15, 6083:6–11, 6106:24–6123:20, 6199:11–20. The trial court further found that the prosecutor had exercised her peremptory challenges for valid reasons. RT 6199:28–6200:2. Once a prosecutor has offered a race-neutral explanation for the peremptory challenges, and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot. *Hernandez*, 500 U.S. at 359, 111 S.Ct. at 1866; *United States v. Bishop*, 959 F.2d 820, 824 (9th Cir.1992).

Here, a review of the record demonstrates that the prosecutor proffered race-neutral explanations for the 23 allegedly racial peremptory challenges. RT 6106:24–6123:20. "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror." *Hernandez*, 500 U.S. at 360, 111 S.Ct. at 1866. The explanation does not have to be persuasive, or even plausible. *Purkett*, 514 U.S. at 768, 115 S.Ct. at 1771. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. *Hernandez*, 500 U.S. at 360, 111 S.Ct. at 1866.

106 S.Ct. at 1723; *Turner v. Marshall*, 63 F.3d 807, 812 (9th Cir.1995).

11. Although it is not necessary to address the issue of whether the petitioner had made a prima facie case of racial discrimination, this Court notes that the jury which convicted the petitioner included five black jurors. *See United States v. Chinchilla*, 874 F.2d 695, 698 n. 4 (9th Cir.1989) (noting that the willingness of a prosecutor to accept minority jurors weighs against making a prima facie showing of racial discrimination).

Thus, it is unnecessary to determine whether the trial court erred in finding that the prosecutor exercised her peremptory challenges for valid reasons. A trial court's determination that there was no racial motive for the prosecution's peremptory challenges is a factual finding entitled to a presumption of correctness. *Purkett,* 514 U.S. at 768, 115 S.Ct. at 1771; *Hernandez,* 500 U.S. 352, 366, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395. This is because "evaluation of the prosecutor's state of mind based on demeanor and credibility lies particularly within a trial judge's province." *Hernandez,* 500 U.S. at 365, 111 S.Ct. at 1859. Thus, the petitioner's claim must fail because he has not rebutted the trial court's finding by clear and convincing evidence, as required under 28 U.S.C. § 2254(e)(1).

## VII

A faulty jury instruction will constitute a violation of due process only where the instruction by itself infects the entire trial to such an extent that the resulting conviction violates due process. *Estelle v. McGuire,* 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991); *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). "It is well established that the instruction may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle,* 502 U.S. at 62, 112 S.Ct. at 482; *Cupp,* 414 U.S. at 146–47, 94 S.Ct. at 400. "It is not sufficient that the instruction is erroneous; rather the petitioner must establish that there was a reasonable likelihood that the jury applied the instruction in a way that violated a constitutional right." *Carriger v. Lewis,* 971 F.2d 329, 334 (9th Cir.1992) (en banc), *cert. denied,* 507 U.S. 992, 113 S.Ct. 1600, 123 L.Ed.2d 163 (1993); *Estelle,* 502 U.S. at 72, 112 S.Ct. at 482.

### CALJIC 10.60:

The petitioner contends that the trial court violated his right to due process of law when it instructed the jury under CALJIC 10.60 that "[i]t is not essential to a conviction of a charge of rape that the testimony of the witness with whom sexual intercourse is alleged to have been committed be corroborated by other evidence." CT 4542; RT 18467. The petitioner argues that this instruction violates due process because it creates the erroneous impression that the complaining witness is entitled to special deference under the law.[12]

In *People of the Territory of Guam v. McGravey,* 14 F.3d 1344 (9th Cir.1994), the Ninth Circuit considered a non-corroboration instruction similar to CALJIC 10.60.[13] After reviewing the non-corroboration instruction within the context of the other instructions given the jury, the Ninth Circuit determined that "the jurors were not misled into believing they were to attach any special weight to the testimony of the alleged victim. In fact, quite to the contrary, the judge gave numerous instructions which made it plain to the jury that it was to treat the testimony of the alleged victim no differently from the testimony of any other witness." *Id.* at 1346–47.

Here, the jury was advised that it was "the sole judge[ ] of the believability of a witness and the weight to be given the testimony of each witness," and the trial court enumerated the factors that the jury could consider in determining witness credibility. CT 4450–55; RT 18373:23–18378:12. Furthermore, the jury was admonished that it was not "to decide an issue of fact in accordance with the testimony of a number of witnesses, which does not convince you, as against the testimony of a lesser number or other evidence, which appeals to your mind with more convincing force." CT 4454; RT 18377:3–11. "[T]he combined effect of these instructions was to make clear that the testimony of each witness was to be judged by the same standard." *McGravey,* 14 F.3d at 1347.

---

**12.** CALJIC 10.60 applies only to the victim's testimony in "a charge of rape." Here, the jury found the petitioner not guilty of the rape charge. Accordingly, the petitioner has not established that the jury applied the challenged instruction in a manner that violated the Constitution. *Estelle,* 502 U.S. at 72, 112 S.Ct. at 482.

**13.** The challenged instruction in McGravey read that "[t]he testimony of a victim of criminal sexual conduct need not be corroborated if the victim is believed beyond a reasonable doubt." *McGravey,* 14 F.3d at 1345.

In addition, the jury was instructed that the prosecution must prove its case beyond a reasonable doubt. CT 4468–69; RT 18386:26–18388:8. As noted by the California Supreme Court, instructing the jury about reasonable doubt "places a heavy burden of persuasion on a complaining witness whose testimony is uncorroborated. CALJIC 10.60 does not affect this instruction but, ... when all the instructions are given, 'a balance is struck which protects the rights of both the defendant and the complaining witness.'" *People v. Gammage,* 2 Cal.4th 693, 701, 7 Cal.Rptr.2d 541, 546, 828 P.2d 682 (1992) (citation omitted).[14]

■ Thus, in light of all the given instructions, "no reasonable juror would believe that the testimony of the alleged victim was entitled to any special deference." *McGravey,* 14 F.3d at 1347. Therefore, the petitioner has not made the requisite showing necessary to secure federal habeas corpus relief under 28 U.S.C. § 2254(d).

**CALJIC 2.27:**

The petitioner also argues that the trial court violated his right to due process of law when it instructed the jury under CALJIC 2.27 that "[y]ou should give the testimony of a single witness whatever weight you think it deserves. However, testimony by one witness which you believe concerning any fact is sufficient for the proof of that fact. You should carefully review all the evidence upon which the proof of such fact depends." CT 4458; RT 18380:22–18381:2. The petitioner asserts that, to the extent that it applies to defense witnesses, CALJIC 2.27 violates the petitioner's right to due process of law because it increases the burden on the defense beyond raising a reasonable doubt as to the petitioner's guilt.

■ The petitioner's argument is without merit. It is readily apparent that CALJIC 2.27 has no effect on the prosecution's burden of proof; it merely instructs the jury that, under California law, the uncorroborated testimony of a single witness, if believed, can be sufficient to prove a fact. The burden is still on the prosecution to prove the petitioner's guilt beyond a reasonable doubt. Thus, CALJIC 2.27 does not dilute the beyond a reasonable doubt standard but "merely suggests careful review when a fact depends on the testimony of one witness." *Gammage,* 2 Cal.4th at 701, 7 Cal.Rptr.2d at 546, 828 P.2d 682; *See also McGravey,* 14 F.3d at 1354–55 (Reinhardt, J. dissenting) (citing with approval CALJIC 2.27 and arguing that it was reversible error not to give a single-witness instruction since the prosecution's case rested solely on the testimony of one witness.); *People v. Turner,* 50 Cal.3d 668, 697, 268 Cal.Rptr. 706, 720, 789 P.2d 887 ("[w]e cannot imagine that the generalized reference to 'proof' of 'facts' in CKLJIC No. 2.27 would be construed by a reasonable jury to undermine the[ ] much-stressed principles" that the People must prove all elements of each charge beyond a reasonable doubt and that the jury must acquit the defendant if it has a reasonable doubt as to whether the People have met their burden of proof.), *cert. denied,* 498 U.S. 1053, 111 S.Ct. 768, 112 L.Ed.2d 787 (1991).

**VIII**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The confrontation clause of the Sixth Amendment provides a criminal defendant with the right to face those who testify against him and the right to conduct cross-examination. *Pennsylvania v. Ritchie,* 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987). The Sixth Amendment's confrontation clause applies to the states through the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965).

The right to confront witnesses serves three purposes: (1) to insure reliability by means of oath, (2) to expose the witnesses to

---

**14.** In *Gammage,* the California Supreme Court upheld the validity of CALJIC No. 10.50, finding that the instruction properly stated a substantive rule of law, and that it neither singled out the testimony of the prosecuting witness with a view toward giving it undue prominence before the jury, nor diluted the "beyond a reasonable doubt" standard. *Id.* at 700–01, 7 Cal.Rptr.2d at 545–46, 828 P.2d at 686–87:

cross-examination, and (3) to permit the trier of fact to weigh the demeanor of the witness. *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970). The confrontation clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective to whatever extent the defense might wish. *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam); *Pavlik v. United States*, 951 F.2d 220, 224 (9th Cir.1991).

The confrontation clause does not prevent a trial court from imposing limits on defense counsel's inquiry into the potential bias of a prosecution witness. *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Wood v. Alaska*, 957 F.2d 1544, 1551 (9th Cir.1992). Thus, "[b]ecause trial judges have broad discretion both to determine relevance and to determine whether prejudicial effect or other concerns outweigh the probative value of the evidence, [this Court] will find a Sixth Amendment violation only if [it] conclude[s] that the trial court abused its discretion." *Wood*, 957 F.2d at 1549; *United States v. Sherman*, 821 F.2d 1337, 1341 (9th Cir.1987).

When cross-examination relates to impeachment evidence, the test is whether the jury had sufficient information to appraise the biases and motivations of the witness. *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1435–36; *Bright v. Shimoda*, 819 F.2d 227, 228 (9th Cir.1987), *cert. denied*, 485 U.S. 970, 108 S.Ct. 1246, 99 L.Ed.2d 444 (1988). The federal courts "do not require a trial court to permit cross-examination on topics of very slight or marginal relevance simply upon the theory that bias or prejudice might be disclosed." *Chipman v. Mercer*, 628 F.2d 528, 531 (9th Cir.1980).

The petitioner argues that the trial court erroneously failed to "allow cross-examination of Kelly Timmons[ ] o[n] her false claim that [ ] she became pregnant as a result of the alleged rapes in this case." During the cross—examination of Ms. Timmons, defense counsel asked: "[A]t some point in time, did you blame a pregnancy that you had on the incident that happened on May the 9th?" RT 12439:14–16. The prosecutor objected and, at a side bar conference, it was asserted that Ms. Timmons had made a false claim that she was pregnant due to the alleged rapes, even though medical tests had indicated she was not. RT 12440:13–16. It was further claimed that even after it had been determined that she was not pregnant, Ms. Timmons had called the district attorney and stated that she was pregnant in an attempt to get financial assistance. RT 12440:18–12442:7. The trial court ruled that the evidence was inadmissible under California Evidence Code § 352 because "the probative value is outweighed by the time consumption, [and] by the prejudice by veering off into all the different areas, whether she gets assistance, whether she has had a previous abortion." RT 12504:11–12528:3, RT 12955:23–28.

The prohibited question solely addressed the credibility of Kelly Timmons.[15] Yet, the defendants, over seven days, extensively cross-examined Ms. Timmons, attacking her credibility; they engaged in detailed questioning regarding inconsistencies and admitted falsehoods in Ms. Timmons' testimony. *See*, e.g., RT 12714:7–12716:22, 12727:13–25, 12730:24–12731:15. Further, to prevent jury confusion, counsel stipulated that, Ms. Timmons "did not get pregnant as a result of the alleged rapes on May 9, 1988, and obviously it is still your duty to decide if the alleged rapes did occur on that date." RT 12860:22–26.

■ "When substantial cross-examination has taken place, courts are less inclined to find confrontation clause violations." *Bright*, 819 F.2d at 229. Moreover, the effectiveness of the defendants' cross-examination and impeachment of Ms. Timmons' testimony is obvious: neither the petitioner nor his co-defendants were convicted of any alleged sexual offenses, offenses that relied solely on Ms. Timmons' testimony. CT 4733, 4735–36. Thus, it is evident that the jury was not denied sufficient information to appraise the biases and motivations of the witness, *Van*

**15.** On direct examination, Ms. Timmons admitted that she had perjured herself during earlier testimony. RT 11332:10–20.

*Arsdall,* 475 U.S. at 680, 106 S.Ct. at 1435–36, and the trial court did not abuse its discretion when it prevented inquiry into Ms. Timmons' false pregnancy claim.

## RECOMMENDATION

IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) adopting the Report and Recommendation as the findings of fact and conclusions of law herein; and (3) directing that Judgment be entered denying the petition and dismissing the action with prejudice.